**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**LUFKIN DIVISION**

S.L.H., an individual,

Plaintiff,

v.

G6 HOSPITALITY, LLC;
G6 HOSPITALITY FRANCHISING, LLC; and
SHIV AIRPORT HOTEL LLC
d/b/a MOTEL 6,

Defendants.

Civil Action No.: _______________

**JURY TRIAL DEMANDED**

**PLAINTIFF'S COMPLAINT**

_______________________________

COMES NOW Plaintiff S.L.H., by and through the undersigned counsel, and respectfully submits her Complaint for damages and makes the following averments.

**INTRODUCTION**

1. This action for damages is brought by S.L.H. ("Plaintiff"), a survivor of sex trafficking, under the Federal William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), 18 U.S.C. § 1595.

2. Plaintiff meets the definition of a sex trafficking victim as she was induced by force, fraud and coercion by her trafficker to have sex with sex buyers at Defendants' subject

hotel, located at 1377 Virginia Avenue, East Point, GA 30344, in 2016 and through and inclusive of 2018.

3. Defendants G6 Hospitality, LLC and G6 Hospitality Franchising, LLC will collectively be referred to as "G6," "G6 Defendants," or "Franchisor Defendants." Upon information and belief, they owned, operated or co-operated, controlled, and/or managed the Motel 6 located at 1377 Virginia Avenue in East Point, Georgia (the "Subject Hotel").

4. Shiv Airport Hotel LLC is herein referred to as the "Franchisee Defendant." Upon information and belief, the Franchisee Defendant owned, operated, or co-operated, controlled, and/or managed the Subject Hotel through the G6 franchising system, and owned and/or operated the Subject Hotel throughout the period during which Plaintiff was trafficked as alleged herein.

5. Section 1591 of the TVPRA criminalizes sex trafficking of adults by force, fraud or coercion. See 18 U.S.C. § 1591. Separately, § 1595 of the TVPRA provides individuals who are victims of sex trafficking with a civil remedy against the traffickers or the beneficiaries of the sex trafficking crime. See 18 U.S.C. § 1595(a). More specifically, § 1595 provides for three distinct causes of action: (1) a claim against the trafficker who directly violated § 1591(a)(1) — a criminal statute; (2) a beneficiary claim against the trafficker who directly violated § 1591(a)(2) — a criminal statute; and (3) a beneficiary claim against a civil defendant who did not violate § 1591, but who "knowingly benefit[ed], financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter." 18 U.S.C. § 1595(a); the subject lawsuit is applicable, in part, to prong three, i.e. a beneficiary claim against civil defendants.

## PARTIES

6. Due to the sensitive, private, and potentially retaliatory nature of the allegations herein, Plaintiff's name and address are not contained in this Complaint to protect the safety, privacy and identity of this subject sex trafficked victim. Nationwide similarly situated Plaintiffs have proceeded by pseudonym or by their initials due to the foregoing.

7. Plaintiff S.L.H. is a resident of North Carolina.

8. Defendant G6 Hospitality, LLC is a for-profit Delaware limited liability company with its principal place of business at 6509 Windcrest Drive, Suite 100, Plano, Texas 75024. It may be served through its registered agent, Cogency Global Inc., 1601 Elm Street, Suite 400, Dallas, Texas 75201.

9. Defendant G6 Hospitality Franchising, LLC is a for-profit Delaware limited liability company with its principal place of business at 6509 Windcrest Drive, Suite 100, Plano, Texas 75024. It may be served through its registered agent, Cogency Global Inc., 1601 Elm Street, Suite 400, Dallas, Texas 75201.

10. Defendant Shiv Airport Hotel LLC, upon information and belief doing business as Motel 6, is, upon information and belief, a for-profit limited liability company with its principal place of business in Georgia. Since in or about December 2015, said Defendant has owned the Motel 6 hotel located at 1377 Virginia Avenue, East Point, GA 30344, and at all relevant times said Defendant owned, operated, controlled, and/or managed the Subject Hotel through the G6 franchising system, including during the period in which Plaintiff was trafficked, in 2016 and through and inclusive of 2018.

## JURISDICTION AND VENUE

11. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

12. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim — including the franchising venture between Franchisee Defendant and the G6 Defendants pursuant to which the Subject Hotel was operated, branded, and controlled — occurred, in substantial part, in Texas and in the Eastern District of Texas.

13. Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because one or more Defendants reside in this district and all Defendants are residents of the State of Texas.

14. G6 Hospitality, LLC and G6 Hospitality Franchising, LLC have the same principal place of business, which is at 6509 Windcrest Drive, Suite 100, Plano, Texas 75024, within the Eastern District of Texas. Each of the G6 Defendants is therefore a resident of the Eastern District of Texas for the purpose of § 1391(b)(1).

15. Under 28 U.S.C. § 1391(c)(2), Franchisee Defendant is a resident of Texas for the purpose of § 1391(b)(1) because the Court has personal jurisdiction over Franchisee Defendant.

16. Under 28 U.S.C. § 1391(d), Franchisee Defendant is a resident of the Eastern District of Texas for the purpose of § 1391(b)(1) because, if the Eastern District of Texas were a separate state, Franchisee Defendant's contacts with the district would be sufficient to subject it to personal jurisdiction.

17. Plaintiff's claims against Franchisee Defendant arise out of Franchisee Defendant's contacts with Texas, including through Franchisee Defendant's relationship with the G6 Defendants, which have their principal place of business in the Eastern District of Texas.

18. Franchisee Defendant's participation in a venture with the G6 Defendants operating the Subject Hotel occurred, in substantial part, in Texas and in the Eastern District of Texas because:

a. upon information and belief, Franchisee Defendant actively sought out a franchising relationship by contacting the G6 Defendants in Texas;

b. on information and belief, Franchisee Defendant acknowledged that the negotiation, execution, and acceptance of the franchising agreements occurred in the Eastern District of Texas;

c. on information and belief, Franchisee Defendant agreed that its ongoing performance of the franchising agreement would take place, in part, in the Eastern District of Texas;

d. on information and belief, the franchising agreements had a choice of law provision selecting the law of Texas as the governing law;

e. on information and belief, the franchising agreements required Franchisee Defendant to report information to the G6 Defendants in Texas, including information about all incidents involving safety, security, public relations, or serious injuries to persons or property that occur at, or involve, the Subject Hotel, including those involving sex trafficking victims like S.L.H.;

f. on information and belief, Franchisee Defendant agreed to submit all notices required under the franchising agreement to the G6 Defendants in the Eastern District of Texas;

g. on information and belief, Franchisee Defendant was required to attend training and meetings in Texas;

h. the G6 Defendants dictated policies related to safety, security, human trafficking, employee training and Franchisee Defendant's response, as well as other subjects, from their principal place of business in the Eastern District of Texas;

i. on information and belief, Franchisee Defendant had an ongoing obligation to participate in centralized programs operated by the G6 Defendants from their principal place of business in the Eastern District of Texas;

j. on information and belief, Franchisee Defendant was required to purchase insurance on behalf of one or more Texas entities (the G6 Defendants);

k. upon information and belief, reservation information for rooms at the Subject Hotel passed through a system operated and managed by G6 from its principal place of business in Texas;

l. upon information and belief, payment information for rooms at the Subject Hotel passed through a system operated and managed by G6 in Texas;

m. on information and belief, the benefit that Franchisee Defendant received from room rentals was governed by the Texas franchising agreement;

n. on information and belief, Franchisee Defendant agreed to make all payments due under the franchising agreement at the G6 principal place of business in the Eastern District of Texas;

o. Franchisee Defendant's operation of the Subject Hotel was controlled and/or influenced by many policies set and enforced by the G6 Defendants from their principal place of business in Plano, Texas;

p. on information and belief, Franchisee Defendant signed a software licensing agreement with the G6 Defendants for the property management software the G6

Defendants required Franchisee Defendant to use when operating the Subject Hotel, including, but not limited to, when booking rooms at the hotel and processing payment for those rooms; and

q. on information and belief, Franchisee Defendant agreed to file any lawsuit arising from the licensing agreement in the Eastern District of Texas and waived personal jurisdiction and venue objections.

## FACTS

### I. S.L.H. was a Victim of Unlawful Sex Trafficking at the Subject Hotel Owned, Operated, Managed, and Controlled by Defendants.

19. In 2016 and through and inclusive of 2018, Plaintiff S.L.H. was trafficked at the Subject Hotel by her trafficker. Under the control of her trafficker, S.L.H. was induced by force, fraud, and coercion to engage in commercial sex acts at the Subject Hotel.

20. Plaintiff was trafficked by a male trafficker who operated a commercial sex trafficking enterprise at the Subject Hotel and who also sold marijuana.

21. In order to induce S.L.H. by force, fraud, and coercion to engage in sex with sex buyers at Defendants' hotel, her trafficker used various means to do so including:

a. the trafficker physically abused and assaulted S.L.H., at times leaving visible bruises on her body;

b. the trafficker took S.L.H.'s phone and identification;

c. the trafficker threatened S.L.H. and instilled in her the fear of bodily injury if his directives were not complied with;

d. the trafficker required S.L.H. to meet a daily quota, usually $500 and sometimes more, before she could stop;

e. psychological coercion; and

f. other means of force, fraud, and coercion used by the trafficker to induce her to have sex with sex buyers at the Subject Hotel.

22. At the direction and under the control of her trafficker, Plaintiff was advertised for commercial sex acts online, including through Backpage, MegaPersonals, SkipTheGames, and Craigslist, using the internet and Wi-Fi services available at the Subject Hotel. Sex buyers responding to those advertisements came to the Subject Hotel, where rooms had been rented for the trafficking.

23. S.L.H. was, at times, also forced to solicit sex buyers in the lobby and parking lot of the Subject Hotel and outside the hotel, wearing obviously revealing clothing, including booty shorts, fishnet stockings, bikini tops, and heels.

24. At times, when they did not have enough money for a room, the trafficker and S.L.H. waited in the lobby of the Subject Hotel, where S.L.H. met a sex buyer and the room was then checked into, in front of Defendants' staff.

25. Housekeeping staff at the Subject Hotel regularly entered the rented rooms. At times, condom wrappers were in the trash, lingerie and heels were in the room, and the room smelled of marijuana, and a housekeeper, at times, commented on the condoms in the trash.

26. S.L.H.'s trafficking had profound effects on her, consistent with "red flags" of trafficking that are well-recognized in the hospitality industry. These effects were obvious and apparent to the staff and management of the Subject Hotel, including effects on S.L.H.'s appearance, demeanor, movements throughout the hotel, her visible bruises and injuries, and her interactions with her trafficker, hotel staff, and others.

**II. The Hotel Industry's Role in Sex Trafficking and Defendants' Knowledge of the Problem.**

27. The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what the Franchisor Defendants and Franchisee Defendant knew or should have known regarding the trafficking at the Subject Hotel, including the trafficking of S.L.H..

28. Sex trafficking is pervasive in the United States, and hotels and motels are among the most common venues where it occurs. For years, sex traffickers have been able to reap their profits with little risk when operating within hotels.

29. Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking.

30. Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, and ECPAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.

31. Some of the recommended policies and procedures intended to reduce or eliminate sex trafficking, which Defendants are aware or should be aware of, include learning to identify warning signs and indicators of sex trafficking, including but not limited to: individuals showing signs of fear, anxiety, tension, submission, and/or nervousness; individuals showing signs of physical abuse; individuals exhibiting evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way; individuals showing signs of malnourishment, poor

hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior; individuals lacking freedom of movement or being constantly monitored; individuals avoiding eye contact and interaction with others; individuals having no control over or possession of money or ID; individuals dressed inappropriately; individuals having few or no personal items; drug abuse or frequent use of drugs; possession of bulk sexual paraphernalia such as condoms or lubricant; possession or use of multiple cell phones; and possession or use of large amounts of cash or pre-paid cards.

32. The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff.

33. Toolkits specific to the hotel industry have been developed which help hotel staff in every position identify and respond to signs of sex trafficking. From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel.

34. All Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing the Subject Hotel, when enacting and enforcing policies and procedures applicable to the Subject Hotel and when training, educating, and supervising the staff of the Subject Hotel.

35. Each of the Defendants had a responsibility to adopt, implement, and adequately enforce policies to avoid facilitating sex trafficking and to train hotel staff to identify and respond to "red flags" of sex trafficking.

**III. Defendants had actual and constructive knowledge of the trafficking at the Subject Hotel.**

36. Upon information and belief, each of the Defendants has known, since well before S.L.H.'s trafficking, that sex trafficking occurs at Motel 6 properties.

37. Upon information and belief, Defendants knew or should have known about the trafficking at the Subject Hotel based on:

a. the obligation of hotel staff and hotel management to report suspected criminal activity including sex trafficking to the G6 Defendants;

b. the Defendants' collection and monitoring of customer surveys and complaints;

c. the Defendants' regular inspections of the hotel property;

d. the direct observations and conduct of Defendants' own staff at the Subject Hotel, as alleged herein; and

e. other sources of information available to Defendants.

38. All knowledge from the staff at the Subject Hotel is imputed to G6.

**IV. The Assault of S.L.H. at the Subject Hotel in View of Defendants' Staff.**

39. In 2016, at the Subject Hotel, S.L.H.'s trafficker assaulted her on the balcony outside the rented room, repeatedly striking her, including with a lit cigarette, until she lost consciousness.

40. S.L.H. suffered severe injuries, including a broken nose, a collapsed left nasal cavity, a tooth knocked out, a skull fracture, and a cracked eye socket.

41. A member of Defendants' staff at the Subject Hotel witnessed the trafficker's abuse of S.L.H. and asked her, "Why do you keep letting him do that to you?" Defendants' staff took no action to report the assault or to intervene.

42. The same day, a housekeeper at the Subject Hotel cleaned the rented room, saw S.L.H.'s injured face, and told her that the blood would not come out of the towels and sheets and that she would have to pay for them. S.L.H. was charged for the blood-stained sheets and towels.

**V. Defendants knew S.L.H. was being trafficked at the Subject Hotel because of the apparent and obvious "red flags" of sex trafficking.**

43. During the period that S.L.H. was trafficked at the Subject Hotel, there were signs obvious to Defendants that Plaintiff's trafficker was engaged in sex trafficking on the subject premises, including:

a. Steady foot traffic of sex buyers to the rooms used for the trafficking of S.L.H.;

b. S.L.H. was, at times, forced to solicit sex buyers in the lobby, in the parking lot, and outside the Subject Hotel while wearing obviously revealing clothing;

c. S.L.H. and her trafficker, at times, waited in the lobby until a sex buyer arrived, and the room was then checked into in front of Defendants' staff;

d. S.L.H., at times, had visible bruises;

e. S.L.H.'s trafficker assaulted her on the balcony of the Subject Hotel, leaving her with severe facial injuries that were seen by Defendants' staff;

f. Housekeeping staff, at times, saw condoms and condom wrappers in the trash, lingerie and heels in the room, and blood-stained towels and sheets, and the rooms, at times, smelled of marijuana;

g. S.L.H. was advertised for commercial sex acts online, with sex buyers arriving at the property in response;

h. The rooms utilized at the Subject Hotel exhibited signs of commercial sex work; and

i. Other commonly known sex trafficking red flags which Defendants knew or should have known of had anti-trafficking measures been timely and properly implemented at the hotel.

44. Defendants' staff witnessed and observed on a regular and frequent basis signs and indicators of sex trafficking including items set forth in the preceding paragraph.

45. When S.L.H. was being trafficked at the Subject Hotel in 2016 and through and inclusive of 2018, she interacted with Defendants' staff on a frequent basis, and Defendants' staff witnessed and observed S.L.H., her trafficker, as well as a frequent procession of sex buyers going in and out of the subject rented rooms, contemporaneous with other signs and indicators of trafficking occurring on the subject premises.

46. S.L.H. knows that some of the individuals that witnessed and observed red flags indicative of sex trafficking were staff members in that the staff were readily identifiable to S.L.H. either by her knowing of the individual and/or by means of the staff wardrobe/nametag/hotel logo and/or by means of a staff member being in an employee restricted area and/or by means of a staff member being stationed at the front desk of the Subject Hotel.

47. As such, Defendants knew or should have known that S.L.H. was being trafficked at the Subject Hotel.

**VI. Defendants actively facilitated sex trafficking at the Subject Hotel, including the trafficking of S.L.H..**

48. Defendants had both actual and constructive knowledge of the trafficking of S.L.H. at the Subject Hotel because the trafficking was, in part, a consequence of Defendants facilitating her trafficking at the Subject Hotel.

49. Rooms used for the trafficking of Plaintiff at Defendants' subject hotel during the relevant time period were rented by the trafficker, or at the direction of the trafficker, and were used to traffic Plaintiff.

50. Defendants rented rooms to individuals they knew or should have known were engaged in sex trafficking, and of Plaintiff in particular, in violation of the TVPRA.

51. Franchisee Defendant, through its staff, leased rooms used for the trafficking of S.L.H., collected payment for those rooms, and interacted face-to-face with S.L.H., her trafficker, and the sex buyers who frequented the subject rooms on a regular and repeated basis. Franchisee Defendant was involved in the commercial transactions that provided S.L.H.'s trafficker with the venue used to sexually exploit S.L.H..

52. Defendants knowingly benefited from the sex trafficking of Plaintiff at the subject hotel by receiving payment for the rooms used for the trafficking, including as to the Plaintiff, in violation of the TVPRA in 2016 and through and inclusive of 2018.

53. Discovery will inform whether the traffickers, or individuals at the traffickers' direction, booked rooms at the subject hotel that were used for the sex trafficking of the Plaintiff in violation of the TVPRA:

a. under the registrant's proper legal name or a false name;

b. whether cash, prepaid card, debit card or credit card was used at the time of respective booking or renewal; and

c. whether staff of Defendants required for each booking that the renter show their identification.

54. Proceeds derived from the sex trafficking occurring on the subject premises were used to continue to pay for rooms rented at the subject hotel during the time that Plaintiff was being sex trafficked there in violation of the TVPRA.

55. Franchisee Defendant knew or should have known, or was willfully blind to the fact, that S.L.H. was being trafficked and, despite this, benefited from continued association with

her trafficker by providing a venue in the form of hotel rooms and related services to facilitate S.L.H.'s sexual exploitation.

56. Franchisee Defendant also facilitated trafficking at the Subject Hotel, including the trafficking of S.L.H., in ways including:

a. allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

b. inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

c. choosing not to report known or suspected criminal activity including sex trafficking according to reasonable practices, industry standards, and/or applicable franchisor policies and procedures; and

d. creating an environment where the traffickers did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate openly and without concern for detection or interference by the hotel staff.

57. Upon information and belief, the G6 Defendants participated directly in aspects of the operation of the Subject Hotel that influenced whether and to what extent trafficking occurred at the hotel, including but not limited to the trafficking of S.L.H..

58. Upon information and belief, despite having actual or constructive knowledge of sex trafficking at Motel 6 properties, including the Subject Hotel, the G6 Defendants continued participating in a venture at the Subject Hotel, with Franchisee Defendant and hotel staff, in a way that they knew or should have known would lead to additional sex trafficking, including but not limited to by the following:

a. the G6 Defendants adopted inappropriate and inadequate practices for selecting, training, supervising, managing, and disciplining franchisees and hotel staff regarding issues related to human trafficking;

b. the G6 Defendants provided inadequate training on issues related to human trafficking and unreasonably delayed providing training;

c. the G6 Defendants failed to ensure that franchisees and hotel staff reported or responded to criminal activity including sex trafficking appropriately;

d. the G6 Defendants attracted traffickers by maintaining a venue where access was easy, risks of interference were low, and traceability was minimal;

e. the G6 Defendants allowed traffickers and sex buyers to reserve and pay for rooms using cash, which provided relative anonymity and non-traceability; and

f. the G6 Defendants provided traffickers with access to internet services in a manner that the G6 Defendants knew or should have known would be used to facilitate trafficking by promoting commercial sex services online.

59. If G6 had exercised reasonable diligence in the areas of the operation of the Subject Hotel over which it retained control, G6 would have prevented the Subject Hotel from being used to facilitate sex trafficking, including the trafficking of S.L.H..

**VII. Defendants' ventures at the Subject Hotel.**

60. Through the conduct described above, the G6 Defendants and Franchisee Defendant knowingly benefited from engaging in a venture with sex traffickers at the Subject Hotel, including S.L.H.'s trafficker, as follows:

a. the G6 Defendants and Franchisee Defendant both received benefits, including increased revenue, from the rental of rooms used for the trafficking of S.L.H. at the Subject Hotel;

b. this venture engaged in violations of 18 U.S.C. § 1591 through the actions of the traffickers at the Subject Hotel, which the G6 Defendants and Franchisee Defendant knew or should have known about;

c. the G6 Defendants and Franchisee Defendant associated with the traffickers, including S.L.H.'s trafficker, by continuing to provide rooms used for the trafficking despite having actual or constructive knowledge of their sex trafficking activity;

d. the G6 Defendants and Franchisee Defendant had a mutually beneficial relationship with the traffickers at the Subject Hotel, fueled by the sexual exploitation of victims, including S.L.H.;

e. the traffickers, including S.L.H.'s trafficker, used the Subject Hotel for their trafficking because of an implicit understanding that the Subject Hotel was a venue that would facilitate their trafficking, providing minimal interference and lowering their risk of detection, which resulted in benefits, including increased revenue, to the G6 Defendants and Franchisee Defendant;

f. the G6 Defendants and Franchisee Defendant participated in this venture through the conduct described throughout this Complaint, as they were jointly responsible for relevant aspects of hotel operations; and

g. S.L.H.'s trafficking at the Subject Hotel was a result of the G6 Defendants' and Franchisee Defendant's participation in a venture with the traffickers.

61. Plaintiff's trafficker repeatedly operated their sex trafficking business out of Defendants' subject hotel in 2016 and through and inclusive of 2018, with rooms used for the trafficking being rented and renewed on a repeated basis. This repeated pattern evidences a continuous business relationship between the trafficking operation and the Subject Hotel.

62. The repeated rental of rooms used for the trafficking of Plaintiff at Defendants' hotel was not a standard arm's length transaction, but rather the repeated room rental transactions which occurred during the time that Plaintiff was trafficked at the subject hotel were colored by overt indicators of sex trafficking — including the steady procession of sex buyers, Plaintiff soliciting in the lobby and parking lot in revealing clothing, Plaintiff's visible bruises, and the severe injuries she suffered at the Subject Hotel — such that Defendants knew, or should have known, that they were renting rooms to, and facilitating, individuals engaged in sex trafficking, and of Plaintiff in particular, in violation of the TVPRA.

63. Franchisee Defendant's association with the Plaintiff's sex trafficker was a venture because Plaintiff's trafficker had prior and ongoing commercial and other dealings with said Defendant at the subject hotel premises by means of rooms repeatedly rented for the trafficking during the time period of Plaintiff's trafficking, which said Defendant knew, or should have known, were being used for the sex trafficking of Plaintiff in violation of the TVPRA, and which the parties wished to continue for profit.

64. Franchisor Defendants were engaged in a venture with Plaintiff's trafficker through said Defendants' staff and through the franchising venture by which the Subject Hotel was operated, branded, and controlled.

65. Through the conduct described above, each Defendant also knowingly benefited from engaging in a commercial venture with other Defendants operating the Subject Hotel.

Defendants associated with one another and with the hotel staff to operate the Subject Hotel. Each Defendant received financial benefits from operating the Subject Hotel, including revenue generated specifically by renting rooms used for the trafficking. They engaged in revenue sharing and had a common incentive to maximize revenue.

**VIII. Franchisee Defendant and the Staff at the Subject Hotel Acted as Actual Agents of G6.**

66. G6 is vicariously liable for the acts, omissions, and knowledge of Franchisee Defendant and staff at the Subject Hotel, which are G6's actual agents or subagents.

67. The G6 Defendants subjected Franchisee Defendant to detailed standards and requirements regarding the operation of the Subject Hotel through the franchising agreements, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by the G6 Defendants.

68. Upon information and belief, G6 exercised and reserved the right to exercise systemic and pervasive control over Franchisee Defendant's day-to-day operation of the Subject Hotel, including:

a. requiring franchisees and management to participate in mandatory training programs covering all aspects of hotel operations;

b. controlling training content and methods for hotel staff;

c. requiring use of specific technology, hardware, software, and property management systems;

d. controlling channels for guest complaints and directly participating in responses;

e. regularly auditing books and records;

f. conducting inspections;

g. retaining the right to issue fines, require corrective action plans, and terminate franchising agreements; and

h. imposing detailed recordkeeping and reporting requirements regarding virtually all aspects of hotel operations.

69. G6 directly participated in and retained day-to-day control over renting rooms at the Subject Hotel by, among other things:

a. controlling details of the guest reservation, check-in, and payment processes;

b. making reservations and accepting payment through a central reservation system;

c. controlling room rates, required discounts, mandatory fees, and rewards programs;

d. controlling policies and procedures regarding check-in, payment and identity verification; and

e. requiring franchisees to use G6's property management system for virtually all aspects of room reservations and payment.

**IX. G6 Defendants are jointly responsible for the trafficking of S.L.H..**

70. All the G6 Defendants were participants in a joint venture, which involved a common enterprise, profit-sharing, a community of interests, and joint rights of control and management, and are vicariously liable for the violations of the other participants in the joint venture.

71. Upon information and belief, operation of the Subject Hotel was part of a single unified operation by G6 Defendants. Upon information and belief, all G6 Defendants shared a common parent company, were subject to joint control, and operated as an integrated enterprise and/or as alter-egos.

**X. Defendants are Jointly and Severally Liable for S.L.H.'s Damages.**

72. The venture or ventures in which each Defendant participated were direct, producing, and proximate causes of the injuries and damages to S.L.H..

73. Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to S.L.H. for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

**CAUSES OF ACTION — SEX TRAFFICKING UNDER THE TVPRA**

74. S.L.H. incorporates all other allegations.

**Count I. Cause of Action: Beneficiary Liability under § 1595(a) of the TVPRA (all Defendants)**

75. S.L.H. is a victim of sex trafficking within the meaning of 18 U.S.C. §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C. § 1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

76. Through acts and omissions, and participation, described throughout this Complaint, Defendants received a financial benefit from participating in a venture with traffickers, including S.L.H.'s trafficker, despite the fact that each Defendant knew or should have known that these traffickers were engaged in violations of 18 U.S.C. § 1591(a)(1) and 18 U.S.C. § 1591(a)(2). Thus, Defendants are liable as beneficiaries under 18 U.S.C. § 1595(a).

77. Through the acts and omissions described throughout this Complaint, G6 Defendants received a financial benefit from participating in a venture with Franchisee

Defendant regarding the operations of the Subject Hotel even though G6 Defendants knew or should have known that this venture was violating 18 U.S.C. §§ 1591(a) and 1595(a).

78. Violations of 18 U.S.C. § 1595(a) by Defendants as "beneficiaries" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause S.L.H. to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Defendants' hotel property.

**Count II. Cause of Action: Vicarious Liability for TVPRA Violations (G6 Defendants)**

79. Under the TVPRA and the federal common law, each member of a joint venture is vicariously liable for the acts and omissions of all other members of that joint venture.

80. Under the TVPRA and the federal common law, an entity is vicariously liable for the acts and omissions of its alter-egos.

81. Franchisee Defendant acted as the actual agent of G6 Defendants when operating the Subject Hotel.

82. Through the acts and omissions described throughout this Complaint, G6 Defendants exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by Franchisee Defendant to operate the Subject Hotel.

83. G6 Defendants are vicariously liable for the TVPRA violations of Franchisee Defendant and the subagents of that franchisee.

## DAMAGES

84. Defendants' acts and omissions, individually and collectively, caused S.L.H. to sustain legal damages.

85. Defendants are jointly and severally liable for all past and future damages sustained by S.L.H..

86. Defendants' involvement and failure, by their agents, servants, staff, and employees, to timely and properly prevent the sex trafficking or timely intervene regarding same was a proximate and competent cause and substantial factor in causing S.L.H.'s severe injuries in this case including, but not limited to, being the victim of sex trafficking when at the Subject Hotel and suffering personal injury and the trauma physically and mentally of being induced to engage in commercial sex with sex buyers while being trafficked, and while simultaneously being under fear of harm if she did not comply, and being physically abused, including the severe beating she suffered at the Subject Hotel, as well as all residual injuries.

87. S.L.H. being sex trafficked at the Subject Hotel was a proximate cause, competent cause, and substantial factor in causing her severe and permanent injuries including but not limited to personal injuries including the horror of being a victim of sex trafficking as well as significant levels of psychological trauma due to the levels of abuse she was caused to endure during the time she was trafficked.

88. As a direct and proximate result of Defendants' involvement, enabling, and multiple failures to act, mandate, establish, and execute anti-trafficking measures and modify their anti-trafficking efforts at the Subject Hotel, S.L.H. was sex trafficked, sexually exploited, and victimized repeatedly at Defendants' hotel in violation of the TVPRA.

89. As a consequence of being sex trafficked at the Subject Hotel, S.L.H. suffered and will continue to suffer substantial economic, physical, mental, emotional, psychiatric, and psychological injuries as the result of being trafficked and sexually exploited at the Subject Hotel in violation of 18 U.S.C. § 1591.

## TOLLING OF LIMITATIONS

90. S.L.H. was under the control, coercion, and manipulation of her trafficker through at least 2018, and as a result, S.L.H. lacked the information and capacity to understand her injuries and their legal causes.

91. Thus, S.L.H. did not discover and could not reasonably have discovered the legal cause of her injury—through no fault of her own—and lacked the information and understanding to bring a claim because she did not know both her injury and the cause of her injury. This lack of information was a direct result of S.L.H. being kept under the control, coercion, and manipulation of her trafficker, which Defendants facilitated.

92. At the time S.L.H. was harmed, she did not know that she was the victim of human trafficking as that term is defined by law, that her injury arose from being "trafficked" at Defendants' hotel or that she was a person "trafficked," much less that she was the "victim" of a legal venture involving Defendants, and she did not discover and was not in a position to discover the legal cause of her injury for years after her trafficking ended.

93. To the extent any Defendant asserts an affirmative defense of limitations, S.L.H. invokes the doctrine of equitable tolling because, as a result of being a victim of trafficking, S.L.H. faced extraordinary circumstances, which arose through no fault of her own, that prevented her from filing a lawsuit, and those circumstances did not end more than 10 years before S.L.H. filed this lawsuit.

94. While under the control of her trafficker through at least 2018, S.L.H. did not have the freedom to investigate her claims, to identify those responsible, or to seek legal representation necessary to pursue her legal rights. S.L.H. could not have pursued her claims while under the active control of her trafficker despite the exercise of ordinary diligence.

95. To the extent any Defendant asserts an affirmative defense of limitations, S.L.H. invokes the continuing violation doctrine because this lawsuit arises out of a pattern of continuous and ongoing tortious conduct by Defendants.

96. S.L.H. was subject to continuous trafficking at the subject hotel from 2016 through at least 2018, which ended not more than 10 years before S.L.H. brings this lawsuit.

97. This continuous trafficking resulted from Defendants' facilitation of trafficking at the subject hotel as described above.

98. The TVPRA's ten-year limitations period, 18 U.S.C. § 1595(c), is subject to equitable tolling. See Arellano v. McDonough, 598 U.S. 1, 6–7 (2023) (federal statutes of limitations are presumed to be subject to equitable tolling); Doe v. G6 Hospitality, LLC, No. 3:25-CV-0770-D, ECF No. 53 (N.D. Tex. Sept. 22, 2025) (holding that the limitations periods prescribed by § 1595(c) are subject to equitable tolling).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants as identified in the above-referenced Counts and as follows:

a. All available compensatory damages for the described losses with respect to the above cause of action;

b. Past and future emotional distress;

c. Consequential and/or special damages;

d. All available noneconomic damages, including without limitation pain, suffering, and loss of enjoyment of life;

e. Physical pain and suffering;

f. Disgorgement of profits obtained through unjust enrichment;

g. Restitution;

h. All damages allowable under the TVPRA;

i. Reasonable and recoverable attorney's fees;

j. Punitive damages with respect to each cause of action;

k. Costs of this action;

l. Prejudgment and all other interest recoverable; and

m. Such other and further relief to which S.L.H. may, in law or in equity, show herself to be justly entitled.

**DEMAND FOR JURY TRIAL**

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: October 13, 2026

Respectfully submitted,

/s/ Jason Byrd
Jason Byrd
THE BYRD LAW FIRM
448 Orleans
Beaumont, TX 77701
Telephone: (409) 924-0660
Facsimile: (409) 924-0035
jason@txbyrd.com

Randolph Janis, Esq.
DOUGLAS AND LONDON, P.C.
One State Street, 35th Floor
New York, NY 10004
Telephone: (212) 566-7500
Facsimile: (212) 566-7501
rjanis@douglasandlondon.com

Chloe Makowsky, Esq.
DOUGLAS AND LONDON, P.C.
One State Street, 35th Floor
New York, NY 10004
Telephone: (212) 566-7500
Facsimile: (212) 566-7501

cmakowsky@douglasandlondon.com

Attorneys for Plaintiff